IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 19, 2017

**STATE OF TENNESSEE v. ERICK TENAZ**

**Appeal from the Criminal Court for Davidson County**
**No. 2015-B-1422    Mark J. Fishburn, Judge**

**No. M2016-02442-CCA-R3-CD**

The defendant, Erick Tenaz, appeals his Davidson County Criminal Court guilty-pleaded conviction of conspiracy to commit second degree murder, claiming only that the trial court erred by ordering that he serve his entire nine-year sentence in confinement. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.

Dwight E. Scott, Nashville, Tennessee, for the appellant, Erick Tenaz.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jan Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Originally charged with three counts of attempted first degree murder and one count of felony murder, the defendant pleaded guilty to a single count of conspiracy to commit second degree murder as a Range I offender, with the length and manner of service of the sentence to be determined by the trial court following a sentencing hearing. The defendant failed to include a copy of his own guilty plea submission hearing in the record. He did, however, exhibit to the sentencing hearing and include in the record on appeal a transcript of the hearing for his co-defendant, Sergio Baeza, in which the State summarized the facts of the offenses as follows:

> [T]he State's proof would have been that in the early morning
> hours of Sunday, September 8th, 2013, Sergio Baeza, [the

defendant], Issac Tenaz and Luis Diaz [sic] drove to Club Cielo, which is an after-hours nightclub, it is located at 15115 Old Hickory Boulevard. Surveillance video shows all four men arrive at the club together in a black Honda Accord around 4 o'clock a.m. All four of the men are standing outside of the club near the entrance. And they arrive about 4:00 a.m., they go inside the club, they spend a little bit of time in the club, and then sometime later they're standing outside the club near the entrance when Issac Tenaz appears to get into a verbal confrontation with a male black. During this confrontation, the surveillance video shows Rafi Shalizi swing a Grey Goose bottle and hit Issac Tenaz over the head causing a fairly deep laceration, immediately after this, Mr. Baeza, [the defendant], Issac Tenaz and Mr. Lopez run from the club, and they run back to the black Honda Accord, which they had parked in front of the Porter Paints parking lot. The club security outside the club immediately maces an entire group of individuals because of this incident, Rafi Shalizi is one of the people in the area when the security officers sprayed the mace. Shivon A[bd]ullatif, Nej[y]ar Osman, Priscilla Hernandez all go to aid Mr. Shalizi who is suffering from the effects of the mace, and they walk to an area to the right of the front entrance of the club where Mr. Shalizi lays on the ground. Shivon Abdullatif, Mr. Osman and Ms. Hernandez also began to suffer the effects of the mace and they are standing, bent over in the immediate area of Mr. Shalizi, who is lying on the ground.

Surveillance video from businesses in the area, as well as statements given by both [the defendant] and Issac Tenaz indicate that when Mr. Baeza, both Tenaz brothers and Mr. Lopez reached the black Honda Accord in the nearby parking lot that [the defendant] got into the driver's seat, Luis Lopez got into the front passenger's seat, Issac Tenaz got in the back passenger's seat, and Sergio Baeza got into the back seat behind the driver.

Surveillance video also shows that when the black Honda Accord is turned on, the headlights immediately come on, the car is backed up, and then the headlights are turned off. [The defendant], who is the driver of the car, drives

toward the front entrance of Club Cielo, but is stopped by traffic of others driving in and out of the area. Once their vehicle reaches the area where Mr. Shalizi, Shivon Abdullatif, [Nejyar] Osman and Priscilla Hernandez are lying, standing and bent over, the surveillance video shows muzzle flashes coming from the driver's side of the black Honda Accord. [The defendant] and Issac Tenaz both told detectives in interviews that Sergio Baeza fired multiple shots out of the car at that group of people. Nej[y]ar Osman was struck once in the hip and Shivon Abdullatif was shot eight times and those gunshots resulted in his death.

There were approximately nine 40-caliber cartridge casings, which were found at the scene. There was also a 40-caliber magazine and cartridges that were later found by detectives in [the defendant's] bedroom and there was a nine millimeter magazine located in Issac Tenaz's bedroom, neither of the guns were located.

Mr. Baeza then told the court that, as he and his co-defendants started to drive away from the club, they "seen them" and "just ended up shooting them" for "[r]etaliation for what they did, basically." Mr. Baeza stated that the defendant had provided him with the handgun earlier in the night. According to Mr. Baeza, he asked the group in the car, "'What you want me to do, you want me to go ahead and do something,'" and both the defendant and Issac Tenaz responded, "'Do what you want to do, do what you wanna do.'" Mr. Baeza testified that, following the shooting, he gave the gun to the defendant and Issac Tenaz, and Mr. Baeza "guess[ed]" that the brothers "got rid of it."

At the sentencing hearing, Metropolitan Nashville Police Department ("Metro") Detective Danny Warren testified that he was the lead investigator in the homicide of Mr. Abdullatif. Through the testimony of Detective Warren, the State introduced into evidence video surveillance footage taken from both Club Cielo and the neighboring Porter Paints store. Detective Warren determined that the defendant was driving the vehicle from which the gunshots emanated.

Detective Warren interviewed both the defendant and Isaac Tenaz. Both men initially denied any involvement in the shooting, but the defendant eventually admitted that Sergio Baeza was the shooter. Both the defendant and his brother admitted to membership in the SUR 13 gang, and Detective Warren opined that the defendant's reluctance to admit that Mr. Baeza was the shooter stemmed from his fear over "snitch[ing] on another gang member."

Detective Warren testified that Mr. Abdullatif suffered multiple gunshot wounds and that nine Smith and Wesson RP casings were recovered from the crime scene. Officers who later conducted a search of the defendant's residence located a pistol magazine "that matched the shell casings at the scene."

Detective Warren opined that Mr. Shalizi, who had struck Isaac Tenaz with a bottle, was likely the intended target of the shooting. Detective Warren conceded that no physical evidence indicated that either of the Tenaz brothers had encouraged Mr. Baeza to fire his weapon, but he believed that the defendant's turning his vehicle's lights on and off prior to the shooting "was a complicit act." Detective Warren stated that Mr. Osman had been struck by a bullet on the night in question but that the wound was not fatal.

Maria Saenz, the defendant's mother, testified that the defendant could reside with her if he were released from confinement. On cross-examination, Ms. Saenz acknowledged that both the defendant and his brother were living with her at the time of the shooting. Ms. Saenz was aware that police officers had found drugs in her home in 2010, but she did not recall that officers had located guns at that time as well. Ms. Saenz had seen the defendant with a handgun prior to the shooting of Mr. Abdullatif, but the defendant had told her that he needed the gun for protection because their residence had been robbed on three occasions. Ms. Saenz was unaware that either of her sons were in a gang, stating that "if they would have been involved with gangs, I feel like they would have been in more trouble because of gang trouble, but they were never involved with anything or in trouble because of that." With respect to her familiarity with the other defendants, Ms. Saenz had heard of Mr. Baeza but had never met him, and she knew Mr. Lopez, but she was unsure whether he was a gang member. Ms. Saenz testified that the defendant "always worked," typically in construction, but that "sometimes the work would run out." Ms. Saenz admitted that the defendant was in juvenile custody for approximately nine months.

Ileana Tenaz, the defendant's sister, presented to the court a letter from a painter indicating that the defendant could work for him upon his release from confinement. Ms. Tenaz stated she would also assist the defendant in obtaining employment. On cross-examination, Ms. Tenaz admitted that she was aware of the defendant's involvement with guns and drugs. Ms. Tenaz denied that the defendant and Isaac Tenaz were gang members. Ms. Tenaz was aware, however, that her brothers were "running around with gang members."

- 4 -

The defendant testified and denied gang membership but admitted associating with gang members. The defendant agreed that he had hesitated to turn in Mr. Baeza because he feared for the safety of his family.

With respect to the night of the shooting, the defendant admitted that he owned the gun used in the shooting and stated that he had purchased it a few months earlier for protection. According to the defendant, Mr. Baeza had asked him for the gun earlier in the night before attending a party but that Mr. Baeza had left the gun inside the defendant's vehicle while the group entered Club Cielo. The defendant denied knowing that Mr. Baeza intended to use the gun, and he denied that anyone in the vehicle encouraged Mr. Baeza to fire the weapon. The defendant stated that he "never intended for [any]body to get hurt."

The defendant read a prepared statement to the court, in which he stated that he took "full responsibility for [his] actions" in "allowing someone else to use" his handgun to take "an innocent life and injure[] other people." If released from incarceration, the defendant stated that he intended to "work[], . . . move on from all this, get into a church, do what [he] can to better [him]self, help [his] family out."

On cross-examination, the defendant admitted that his brother and most of his friends were members of the Surenos gang, but he denied being an "official member." The defendant conceded that Surenos gang members were "giving [him] free phone calls" from jail. The defendant also admitted that he was aware when he provided the gun to Mr. Baeza that Mr. Baeza intended to "shoot" anyone at the party who did not like him. With respect to the shooting at the club, the defendant acknowledged driving the car and turning off the vehicle's lights but he could not explain why he had turned the lights off and then turned them on again following the shooting. The defendant testified that he threw the gun into a lake a few days after the shooting.

At the conclusion of the hearing, the trial court denied all forms of alternative sentencing and imposed a sentence of nine years' incarceration. In ordering confinement, the trial court found numerous enhancement factors to be applicable: that the defendant had a history of criminal convictions or behavior, including his six-year history as a drug dealer as well as his juvenile criminal history of escape from a juvenile detention facility, aggravated burglary, possession of a handgun, and possession with intent to sell marijuana; that the offense involved more than one victim; that the injuries inflicted upon the victims were particularly great; that the defendant provided the gun used in the offense and was aware that the shooter intended to use it; and that the defendant had no hesitation about committing the offense when the risk to human life was high. With respect to mitigating factors, the court found that the defendant eventually assisted law enforcement officers by identifying Mr. Baeza as the shooter.

- 5 -

With respect to alternative sentencing, the court found the defendant's mental and physical health to be "excellent," his work history to be "all right," and his educational history to be "lacking." The court found the defendant's character and social history provided "little confidence that [he] will be able to stay on the straight and narrow if . . . granted an alternative sentence," primarily due to the defendant's association with gang members. Regarding family support, the court found that the defendant had rejected support from his family because his parents' strong work ethic "was an embarrassment" to him. The trial court found that the defendant had previously escaped from a juvenile detention facility, undercutting his compliance with court-ordered programs. The court also specifically found that the defendant had not been truthful in his testimony. Finding this to be "a very serious crime," the court concluded its findings by stating that alternative sentencing "is not appropriate because confinement is necessary to avoid depreciating the seriousness of the offense."

In this timely appeal, the defendant argues that the trial court erred by ordering a fully-incarcerative sentence. The State responds that the denial of alternative sentencing was appropriate.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709. The supreme court expanded the holding in *Bise* to the trial court's decision regarding probation eligibility and other forms of alternative sentencing, ruling "that the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

The imposition of a nine-year sentence in this case mandated the trial court's considering probation as a sentencing option. *See* T.C.A. § 40-35-303(a), (b). Traditionally, the defendant has born the burden of establishing his "suitability for full probation." *State v. Mounger*, 7 S.W.3d 70, 78 (Tenn. Crim. App. 1999); *see* T.C.A. § 40-35-303(b). Such a showing required the defendant to demonstrate that full probation would "'subserve the ends of justice and the best interest[s] of both the public and the defendant.'" *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990) (quoting *Hooper v. State*, 297 S.W.2d 78, 81 (1956), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000)).

When a trial court orders confinement and therefore rejects any form of alternative sentencing such as probation, split confinement, or periodic confinement, it must base the decision to confine the defendant upon the considerations set forth in Code section 40-35-103(1), which provides:

> (1) Sentences involving confinement should be based on the following considerations:
>
> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant; . . . .

T.C.A. § 40-35-103(1). In addition, courts "should consider the circumstances of the offense; the defendant's criminal record, social history, and present condition; the deterrent effect on the defendant; the defendant's potential or lack of potential for rehabilitation; and the best interests of both the defendant and the public." *State v. Jonathon Wayne Thompson*, No. M2016-00129-CCA-R3-CD, slip op. at 7 (Tenn. Crim. App., Nashville, Nov. 4, 2016) (citing *State v. Kendrick*, 10 S.W.3d 650, 656 (Tenn. Crim. App. 1999); T.C.A. § 40-35-103(5)). Moreover, "[c]andor is a relevant factor in assessing a defendant's potential for rehabilitation," and "the lack of candor militates against the grant of probation." *State v. Justin Daniel Adams*, No. M2016-00835-CCA-R3-CD, slip op. at 10 (Tenn. Crim. App., Nashville, March 8, 2017) (citing *State v. Dowdy*, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994); *Kendrick*, 10 S.W.3d at 656).

In our view, the record fully supports the sentencing decision of the trial court. The defendant's involvement in the firing of a handgun into a crowd of people was certainly a serious offense that warranted incarceration, and the defendant's lack of candor and close gang affiliation clearly weighed against an award of alternative sentencing. Under these circumstances, we cannot say that the trial court abused its discretion by ordering that the defendant serve his entire sentence in confinement.

Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE